UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

UNITED STATES OF AMERICA,

        Plaintiff,

   v.                          File No. 1:12-CR-132

JOE CABRERA,

        Defendant.
_____/

Sentencing

Before

THE HONORABLE ROBERT HOLMES BELL
United States District Judge
May 29, 2014

APPEARANCES

PHILLIP J. GREEN                    HAYTHAM FARAJ
RUSSELL A. KAVALHUNA                6 Parklane Blvd.
Assistant U.S. Attorneys            Suite 530
P.O. Box 208                        Dearborn, MI 48126
Grand Rapids, MI 49501              Attorney for Defendant
Attorneys for Plaintiff

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter

```
 1                                      Grand Rapids, Michigan
 2                                      May 29, 2014
 3                                      3:03 p.m.
 4                          -      -      -
 5
 6                   P R O C E E D I N G S
 7
 8          THE COURT:  Good afternoon.
 9          MR. GREEN:  Good afternoon, Your Honor.
10          THE COURT:  We are here in the matter of United
11  States v. Joe Cabrera.  This is our docket 12-CR-132, and I
12  believe we have Mr. Green and Mr. Kavalhuna.  Mr. Green, you
13  will be the spokesperson here?
14          MR. GREEN:  That is correct, Your Honor.
15          THE COURT:  Okay.  And Mr. Faraj is the retained
16  counsel representing Mr. Cabrera in this matter.
17          Okay.  This record should reflect that this Court
18  did take a guilty plea in this matter, and the guilty plea was
19  taken -- there's so much paper here.  Let me catch up with
20  myself here.  The plea was entered in this matter on November
21  11th of 2013 to Count 1 of the fourth superseding indictment
22  charging conspiracy to engage in racketeering activity, 18
23  United States Code 1962(d).  The Court finds that the charge
24  pled to adequately reflects the seriousness of the actual
25  offense behavior in this matter.
```

1              A presentence report was prepared in this matter.

2      Mr. Griffis is here who helped prepare this rather extensive

3      presentence report involving not only Mr. Cabrera, but other

4      individuals on this particular indictment, and apparently it

5      was circulated to the parties in this case.  So the question

6      at this point is are there any objections, errors or additions

7      which this Court should take up, Mr. Green?

8              MR. GREEN:  There are none, Your Honor.

9              THE COURT:  Very well.  At this time, Mr. Faraj?

10             MR. FARAJ:  Your Honor, the defense still has one

11     remaining objection to the report that has not yet been

12     resolved, and --

13             THE COURT:  Have you discussed this with the other

14     counsel and with the presentence writer?

15             MR. FARAJ:  We have, and I submitted a motion to

16     continue to try and resolve it because we were negotiating.  I

17     thought we resolved it.  I was under a misunderstanding as to

18     what we reached, so as of Tuesday this week we were still

19     unresolved.  I filed a motion to adjourn this sentencing

20     hearing so we could try to resolve it.

21             THE COURT:  What's your objection?

22             MR. FARAJ:  It is to the categorization of the

23     stabbing of Ross LeHockey as an attempted murder rather than

24     an aggravated assault.

25             THE COURT:  How does it affect the matter?

1          MR. FARAJ:  It increases the offense level by seven

2     points.

3          THE COURT:  Response?

4          MR. GREEN:  Yes, Your Honor, I apologize.  I was a

5     little taken aback because I don't recall having -- I was not

6     aware this was still an issue.

7          THE COURT:  I wasn't either.

8          MR. GREEN:  But I can respond, Your Honor.

9          The presentence report sets out the facts of what

10    took place here, and the facts that are set out in the

11    presentence report -- and for the record, Your Honor,

12    fortunately I noted this for another reason, so I can cite

13    that we're talking about Paragraph 243 of the presentence

14    report, and if one reviews the information contained in there,

15    it's 243, Paragraph 244, Paragraph 245 and 246.

16          But what those paragraphs recount, Your Honor,

17    factually is a situation in which Ross LeHockey, who was no

18    member of any gang, an innocent bystander at a bar, is

19    attacked by the defendant, Mr. Cabrera, and another member or

20    at least one other member of the Holland Latin Kings.  Mr.

21    Cabrera stabbed Mr. LeHockey with a knife more than once, and

22    if that were not enough, Mr. LeHockey left the bar with his

23    wife, went across the street, and Mr. Cabrera and another --

24    at least one other member of the Latin Kings followed him

25    across the street where they proceeded to attack him again,

1    and Mr. Cabrera stabbed him again.

2            Under the law, use of a deadly weapon is sufficient

3    to infer intent to kill, and in this case where we have

4    multiple stab wounds that took place over more than one

5    occasion, that, Your Honor, I think is more than sufficient to

6    sustain the Probation Department's finding that this is an

7    attempted murder.  Beyond that, Your Honor, this victim was

8    taken to the hospital, was in the Critical Care Unit, suffered

9    life-threatening injuries.

10           MR. FARAJ:  I'll briefly respond, Your Honor.

11           The altercation began as an altercation between Mr.

12   LeHockey and Mr. Cabrera's sister.  It had nothing to do with

13   the Latin Kings at the time.  They were at a bar, there was an

14   altercation, and Mr. Cabrera responded in defense of his

15   sister.

16           The response was disproportionate.  There was never

17   any intent to -- at a murder.  We don't disagree that serious

18   bodily injury, the points for serious bodily injured should be

19   added to the aggravated assault and use of the weapon.  Those

20   should all be added.  But it doesn't arise to an attempted

21   murder when the conditions are different -- the conditions

22   that instigated the assault were a response to an attack by

23   Mr. LeHockey to a family member of Mr. Cabrera.  That's how it

24   all began.

25           THE COURT:  Well, your client stabbed the

 1   individual.

 2               MR. FARAJ:  He did.

 3               THE COURT:  And he stabbed him in a vital organ, not

 4   in his finger or not in his toes.  He stabbed him in the

 5   chest.

 6               MR. FARAJ:  He did stab him in his body.

 7               THE COURT:  Isn't that attempted murder?  What is

 8   it?

 9               MR. FARAJ:  We saw it as an aggravated -- well,

10   there's another reason why we think it amounts to an

11   aggravated assault.  The government agreed to dismiss the

12   special allegations, Your Honor, in Count 1.  All they allege

13   is he beat and stabbed Ross LeHockey.

14               THE COURT:  I think it can stand as it does.  It

15   speaks for itself.  Your objection is noted.

16               Mr. Cabrera, have you had an opportunity to review

17   this presentence report in this matter?

18               DEFENDANT CABRERA:  Yes, I have.

19               THE COURT:  And are you satisfied with the

20   representation here provided by your retained counsel, Mr.

21   Faraj?

22               DEFENDANT CABRERA:  Yes, I am.

23               MR. FARAJ:  I just want to make a correction for the

24   record.  I'm appointed, Your Honor.

25               THE COURT:  Okay.  By this Court?

```
 1                    MR. FARAJ:  Yes, sir.

 2                    THE COURT:  Okay.

 3                    MR. FARAJ:  I was initially retained and then

 4        applied to be appointed.  I just want to correct -- make sure

 5        that that's clear for the record.

 6                    THE COURT:  Well, that's news to me, but I'm glad.

 7        I'm glad.  Very well.  Okay.  Thank you for correcting me.

 8                    Okay.  Are you satisfied?

 9                    DEFENDANT CABRERA:  Yes, I am.

10                    THE COURT:  Okay.  Anything else we should take up

11        before allocution in this matter?  I note there's a request

12        for a variance here in this matter --

13                    MR. FARAJ:  There is, Your Honor.

14                    THE COURT:  -- that has been filed, yes.

15                    MR. FARAJ:  All other objections, for the record,

16        all other objections have been resolved.

17                    THE COURT:  I note that, yes, yes.  Anything else

18        before we proceed with allocution?

19                    MR. GREEN:  Your Honor, I noted in Mr. Haytham

20        Faraj's filing yesterday that he raised a motion for a

21        departure in addition to a variance.  I would like to be heard

22        very briefly on that for the record so that there isn't any

23        question if there's an appeal here as to that issue.

24                    THE COURT:  Okay.

25                    MR. GREEN:  In his sentencing memorandum, Your
```

1    Honor, he's asking the Court to consider a departure under

2    Sentencing Guideline Section 5K2.0.  As this Court is well

3    aware, that section really is intended, and explicitly says

4    so, to address those matters, aggravating or mitigating

5    circumstances that are not otherwise adequately taken into

6    consideration by the guidelines.

7            Now, the defense argument here is that the defendant

8    cooperated.  The defendant proffered to the government.  The

9    government's not filing a 5K1.1 motion.  Therefore, the Court

10   should consider filing a -- or sorry, the Court should

11   consider departing under 5K2.0.  Well, because the conduct of

12   cooperation here is adequately addressed under Section 5K1.1,

13   it would not be considered under 5K2.0.

14           Now, the defendant has cited a case, a Sixth Circuit

15   case in its brief, in his brief suggesting that this case

16   stands for the proposition that the Court can do this.  It's

17   part -- that's partly true.  But here's what the Court said,

18   and the case, Your Honor, is United States v. Truman, and it

19   is a Sixth Circuit case, 2002, 304 F.3d 586.  And what

20   happened in this case just briefly, Your Honor, is that the

21   defendant had been charged federally, cooperated with the DEA.

22   In the course of his cooperation he provided information

23   regarding security procedures at a lab, okay.  He wanted a

24   downward departure for cooperation.  The government didn't

25   file a 5K1.1 because the information didn't have anything to

1    do with the investigation or prosecution of another

2    individual.

3         So the Court had initially said, the District Court

4    had said, Well, I can't give a departure under 5K2.0.  It went

5    up on appeal.  Eventually what the Court resolved is the Court

6    explicitly held in this case that 5K1.1 applies to situations

7    where a defendant cooperates with the government providing

8    information concerning a criminal investigation.  The Court

9    went on to say because in this case the information that

10   Truman, the defendant, provided didn't have to do with a

11   criminal investigation, the Court then did have the discretion

12   to consider that under 5K2.0.

13        So this case, the Truman case, doesn't apply here

14   because even by his own statements in the sentencing

15   memorandum, all he cites to is that he came and he proffered

16   information regarding the Latin Kings.  He did, Your Honor.

17   The information he provided was marginally useful.  He's not

18   testifying.

19        Moreover, Your Honor, what the Court needs to be

20   aware of, and this is reflected in the plea agreement at least

21   implicitly, is that Count 2, Mr. Cabrera's charged in Count 2

22   with use and possession of a firearm in furtherance of a crime

23   of violence, Section 924(c).  As the Court knows better than

24   anyone, that's a five-year mandatory minimum sentence.  We

25   agreed to dismiss that count in consideration of his

1    cooperation.  So he has received no less than a five-year

2    benefit already because as the Court knows, the Court's hands

3    are tied when it comes to a Section 924(c).  Had he been

4    convicted of that, that would have been five years tacked on.

5    So I think, Your Honor, there is no basis for a downward

6    departure under 5K2.0 or any other, for that matter.

7              THE COURT:  Do you wish to respond?

8              MR. FARAJ:  Mr. Green gives you correct facts in

9    Truman.  I did cite to Truman.  I saw the case as standing for

10   the proposition that the Court can on its own motion grant a

11   departure once it is aware of cooperation that may not amount

12   to the type of cooperation the government desires.

13             Frankly, marginal cooperation, but as the Court must

14   know at this point, Mr. Cabrera left in 2009.  He withdrew

15   from this conspiracy.  If you recall from the report, Your

16   Honor, most everything, the 1,070-some paragraphs refer to

17   conduct that happens some before 2009, but much of it is in

18   2010, 2011, and 2012.  So his cooperation was marginal.  He

19   gave the best cooperation he could.  It wasn't very helpful,

20   and so that's what my motion is based on and I'll submit on

21   that.

22             THE COURT:  Well, I'm not sure I would draw the line

23   quite where you draw it, but I don't think we have what we'd

24   call a true departure here of information the government has

25   relied upon that has been used as part of its essential facts

1    in this case.  So I think you still have your variance there,

2    but I think you don't have sufficient basis for the departure.

3           I have this matter as an adjusted offense level of

4    31 and a criminal history level of III with a sentence range

5    before any calculation or departure at 135-168 months in terms

6    of the range of the guidelines.  This Court is not bound by

7    the guidelines.  They are truly guidelines, but anyway, that's

8    what they are.

9           You may come forward at this time in allocution on

10    behalf of your client and I'll hear first from you and then

11    from your client if he would request the same.

12           MR. FARAJ:  Does the Court prefer that Mr. Cabrera

13    go first or myself?

14           THE COURT:  I just said you first and then your

15    client.

16           MR. FARAJ:  I'm sorry, I didn't hear, Your Honor.

17           The Holland Latin Kings were a menace to this

18    community.  They terrorized the residents of Holland.  We all

19    know that.  Just reading the indictment, that becomes clear.

20           But Mr. Cabrera stands unique among all the

21    defendants in that in 2009, in early 2009 before he went to

22    jail or as he was going to jail, he realized that this was not

23    the life for him, and he did something profound.  Rarely do

24    people do this that are involved in RICO conspiracies.  He got

25    out of jail, packed his wife, his two kids, and moved away,

1   moved away to Mississippi.  He left two boys behind that he

2   couldn't take with him because he didn't have custody, but

3   that was a decision he had to make.

4           He found a church.  It changed his life.  He became

5   the husband he never was, the father he should have been all

6   along, and that was his life until that all ended in 2013 when

7   he had to move back to Holland to face these charges.  He's

8   here, he's taken responsibility.

9           I look at the guidelines, and if he was still

10  involved in 2013 when the arrests were being made, I would say

11  that's a fair sentence, Your Honor.  But I read Gall and what

12  the Supreme Court said with respect to the discretion judges

13  have now after Booker.  I see the facts in that case.  I think

14  about the purpose of punishment and the objectives our society

15  has sort of identified as the principles of punishment, and

16  none, none exist here anymore.  This man is changed.

17          Punishment does nothing.  It just takes him away

18  from his kids and his family.  It creates a burden on society

19  when his family become wards of the state.  Our country will

20  have to pay for him to be housed in prison and to be cared for

21  while for the last four years, for the last five years, he did

22  that on his own.  He self-rehabilitated.  He did it

23  permanently.  He moved away and he moved forward.  As you

24  would expect to happen if you were to sentence him to a term

25  of -- a custodial term and you would hope that he would come

```
 1    out and learn his lesson, he's already learned his lesson.

 2              The Court I know has sentenced a number of other

 3    people, and I can't imagine the decision you have to make

 4    now.  You can't -- you don't want to -- you don't want any

 5    disparity in your sentences.  But the Supreme Court has also

 6    said there is no disparity when the defendants are dissimilar,

 7    and I'm not sure if anyone else withdrew from this

 8    conspiracy.  I know many of the people that came before you,

 9    and I've attended a couple sentences, none of them withdrew

10    until they argued after the investigation began or the

11    indictment.

12              So I would ask the Court to consider a non-custodial

13    sentence.  It could be a home confinement.  It could be a work

14    release program.  The possibilities are endless.  But I

15    frankly cannot see how a custodial sentence would serve the

16    best interests of society, understanding that there were real

17    victims in this case.

18              Mr. Ross LeHockey is a victim.  People that were

19    beaten by Mr. Cabrera are victims.  But I imagine them sitting

20    here in court listening to the changes he's made, listening to

21    his connection with God and family, and I believe that they

22    would -- they may ask this Court to be merciful as well.

23              I know Mr. Cabrera wanted to say a few words, so

24    I'll turn it over to him, Your Honor.  Thank you.

25              THE COURT:  Thank you.
```

1          Mr. Cabrera?

2          DEFENDANT CABRERA:  Good afternoon, Your Honor.

3          I just want to let you know that man that you read

4     in the indictment is not the man you see in front of you right

5     now.  The man you see in front of you right now is a man who's

6     turning his life around for his kids, his son, his wife,

7     trying to become a Godly man for his family, trying to be a

8     better son, better husband, better overall man.  I had to make

9     the hardest decision in 2009 to leave two of my sons and pack

10    up, me and my wife, and to get away from the life I --

11         THE COURT:  But you got yourself into it.

12         DEFENDANT CABRERA:  I did.

13         THE COURT:  So getting yourself out of it, what kind

14    of an award should you get for that?  You got yourself into

15    it.

16         DEFENDANT CABRERA:  Yes, I did, Your Honor.  I got

17    myself into it.  I just -- I wanted out of it.  I --

18         THE COURT:  Did you go to the police and say, I

19    don't want anything more to do with it?

20         DEFENDANT CABRERA:  No, I didn't.  I just couldn't

21    hurt my family or hurt anybody more.  I wanted just to get out

22    of it, leave.  I didn't want anybody else to hurt because of

23    me.

24         THE COURT:  Well, did you -- you ran off, in other

25    words.

1           DEFENDANT CABRERA:  Yes, I did.

2           THE COURT:  You ran off to Mississippi and

3     eventually to Florida.

4           DEFENDANT CABRERA:  Yes, I did.

5           THE COURT:  And you kept track of what was going on,

6     didn't you?  You knew that the Latin Kings were being

7     investigated in grand juries and all that, didn't you?

8           DEFENDANT CABRERA:  Well, with the newspaper, yes,

9     due to the fact that --

10          THE COURT:  Okay.  So did you come back then?

11          DEFENDANT CABRERA:  No, I did not.

12          THE COURT:  You waited for them to come and arrest

13    you.

14          DEFENDANT CABRERA:  Well, I didn't know --

15          THE COURT:  Excuse me.  Yes or no?

16          DEFENDANT CABRERA:  Yes.

17          THE COURT:  Okay.  Continue.

18          DEFENDANT CABRERA:  Well, in 2009 I packed up the

19    kids, we left, went to Mississippi.  I found a church there.

20    I was rebaptized.  I got custody of my kids for over a year.

21    They got to see their dad baptized, got to see their dad being

22    a -- changing his life to a Godly man, to trying to follow --

23    to be that better husband, that better dad, where they can run

24    and come to me.

25          Then my -- then they got -- then I ended up going

1    through custody here in Holland where I didn't have any

2    contact.  I just went through the courts to fight for my kids

3    to get custody, and we moved to Florida and I found work

4    there.  Me and my wife were both working there with both of

5    our kids with both of us working, and we had our -- we started

6    over.  We tried -- I tried to be the best husband, the best

7    everything that I could do.  I wanted to leave that life and I

8    left that life, and I honestly changed.

9         And then in 2013, my mom called me, said that a

10   federal agent or officer was -- wanted to contact me, so I

11   called him.  He asked me if I still lived at the address I was

12   at in Florida and I told him yes, and that's when I gave -- I

13   had to give my wife, my daughter and them a hug and kiss and I

14   was extradited to Michigan, and that's when I had to come

15   and -- I'm sorry, Your Honor.  I'm just -- I'm just -- I'm

16   just scared.  I'm nervous.  I'm scared for my family, not

17   knowing what's going to happen to them.  I had to say 'bye to

18   my kids again, which I don't know what's going to happen with

19   me.

20        I just -- I'm just truly, truly scared, and I'm not

21   that man that you read in the indictment.  I am a changed

22   man.  I am trying to be a Godly man for my community, and I

23   just -- I just can't follow the words, Your Honor.  I'm just

24   so --

25   (Mr. Faraj conferred with Defendant Cabrera.)

1       DEFENDANT CABRERA:  Yeah, I want to apologize to my

2  family, everybody I've hurt.  I wish there were -- I wish the

3  people that I hurt were here so I could tell them that I was

4  sorry for all the hurt that I hurt them and their family, and

5  I just wanted to thank you for the time to listen to me.

6       THE COURT:  Did you write to Mr. LeHockey and

7  apologize?

8       DEFENDANT CABRERA:  No.  I didn't know if that would

9  be a -- if I could -- if I would get in trouble for doing that

10 or --

11      THE COURT:  Okay.

12      DEFENDANT CABRERA:  Because I didn't want no --

13      THE COURT:  Now, you come -- Mr. Green, do you have

14 anything you wish to say here?

15      MR. GREEN:  No, Your Honor.  I believe the Court has

16 all the information.

17      THE COURT:  Well, you can give me some additional

18 information if you want to.  You usually have some.

19      MR. GREEN:  Well, the one point I was going to make,

20 the Court's already made, and that is he made the decision to

21 join the gang and he put his family in that position.

22      I would note because I know the Court -- that the

23 presentence reports are fairly long, unlike most of the Latin

24 Kings, Your Honor, who joined at age 12, 13, 14, Mr. Cabrera

25 joined at age 20 in 2003, and I don't -- it's true that he

1    left Michigan.  I have no way of knowing what he did after he

2    left Michigan, but he left Michigan, and certainly the Court

3    should consider all the information and weigh it as it sees

4    fit.

5              But while he was involved in the Latin Kings, he was

6    very involved.  An assault with using golf clubs, which is a

7    dangerous weapon; no less than four drive-by shootings; an

8    attempted murder; and he was up to his eyeballs in the cocaine

9    trafficking.  So there may be two people here.  I'm not in a

10   position to know.  But there's certainly some very serious and

11   disturbing conduct that's reflected in the count of conviction

12   here, Your Honor.

13             THE COURT:  Well, clearly there's about a -- from

14   '03 to '09 there's about a six-year period of time when you

15   were involved with the Latin Kings, isn't there?

16             DEFENDANT CABRERA:  Yes.

17             THE COURT:  And you somehow got through high school,

18   didn't you, without any Latin King real involvement?

19             DEFENDANT CABRERA:  Yes.  Yes, I did, Your Honor.

20             THE COURT:  You knew the people, but you weren't

21   running with them and doing all these kind of things while you

22   were in school, were you?

23             DEFENDANT CABRERA:  That is correct.  I -- you know,

24   Your Honor, I played football ever since I was in sixth grade.

25             THE COURT:  Right.

1          DEFENDANT CABRERA:  All the way to my senior year, I

2     was tight-knit with the football players.  We grew up with

3     that closeness, that thing, and I had a kid my senior year

4     and --

5          THE COURT:  Well, you got a girl pregnant and she

6     had a baby when you were a senior, right.

7          DEFENDANT CABRERA:  Correct, my senior year.  And

8     I -- all of my friends kind of went to college, went to do

9     their thing, and I kind of got lost and I lost my way.  I've

10    fallen and I fell into something where I wanted that closeness

11    to how I had with the football players and I chose the wrong

12    path.

13         THE COURT:  Well, but during that period of time you

14    kept track of your family, didn't you?

15         DEFENDANT CABRERA:  Yes, I did.

16         THE COURT:  Why didn't your family grab you by the

17    nape of the neck?  You had family.  They love you.

18         DEFENDANT CABRERA:  Yes.  I just --

19         THE COURT:  A lot of people don't have fathers and

20    mothers to watch them.  You did.

21         DEFENDANT CABRERA:  That is correct.

22         THE COURT:  You had other relatives, aunts and

23    uncles and other people around there, didn't you?

24         DEFENDANT CABRERA:  Yes.

25         THE COURT:  Did any of them take you aside and say,

1    You fool, wake up?

2                 DEFENDANT CABRERA:  They did.  They did, and I --

3                 THE COURT:  Why didn't you listen to them?

4                 DEFENDANT CABRERA:  I was just stubborn,

5    hard-headed.  I didn't know what --

6                 THE COURT:  What did you think you'd gain out of it?

7                 DEFENDANT CABRERA:  I don't know.  I truly do not

8    know, Your Honor.  All I know is what I did get out of it is

9    hurting my family, hurting my kids, hurting my wife, hurting

10   other people, hurting -- just hurting everybody.  I don't know

11   what I was thinking.  I wasn't thinking.  I just know I hurt

12   so many people and I continue to hurt them, and I'm trying to

13   do my best to be that better man, to be that person, to quit

14   hurting people.  Instead of hurting people, I want to help

15   people.

16                And I know I did too much hurt to my family, to my

17   community, to everybody, and now I got to accept the

18   consequences and deal with that and I understand it, but I

19   just was truly lost.  I don't -- my parents did push me away.

20   They did, and they are together.  They aren't divorced.  I

21   just didn't want to listen.  I was truly, truly lost, but now

22   I'm not.  I just --

23                THE COURT:  Well, frankly I don't understand it.

24   Most of the people that come in front of me, I have to tell

25   you, most of the people, I would say 60 percent of the young

1   men who come in front of me like you do not have a father or a

2   mother, many of them just a mother but no father, nobody

3   that's trying to talk to them or encourage them or in some way

4   put some pressure on them to get out and separate.  So you

5   stand as an enigma to me, how you ever got out of the family

6   circle, and they apparently love you and will do anything for

7   you, how you got out of that family circle and how you -- let

8   me see if I understand this.

9            This is really, really quite egregious, these five

10  or six years.  There were fighting, people were injured with

11  knives and bats and golf clubs, and you carried guns.  You

12  were shooting guns at houses as late as April of '09.  You had

13  kind of a leadership position; not a formal leadership

14  position, but you clearly were operating -- nobody was telling

15  you what to do during that period of time.  You were kind of

16  deciding what you wanted to do.  And obviously your selling of

17  marijuana, your placing money in jail accounts by helping the

18  Latin King members who had been arrested, you had no problems

19  putting money in their accounts.

20           But you did in fact cooperate with the police

21  authorities after you were arrested.  After someone went down

22  or the police down there or something got ahold of you and

23  brought you up here, you did cooperate, and you were

24  remorseful, and I give you a lot of credit for that.  But the

25  damage that you helped undertake in that Holland community is

1    just awful.  You know, I don't know what Mr. LeHockey has to

2    say, but I would think he'd be terrified.  It would be a

3    nightmare that Ross LeHockey has to live with for the rest of

4    his life as a result of what you did.

5            You know, there appear to be a lot of other

6    allegations in here about what you did, but you are unusually

7    cooperative.  You did come in out of the rain, so to speak,

8    and appear to truthfully have begun a new lifestyle, and for

9    that I commend you.  But what you did during this six-year

10   period is absolutely egregious.  Absolutely egregious.

11           Now, if you hadn't had anybody that raised you, that

12   taught you right from wrong or anybody that didn't care for

13   you as it seems to me most of these people that are coming in

14   front of me these days, then that would be one thing, but you

15   knew what you were doing was wrong.  So I have to look at the

16   circumstances of the offense and I have to look at your

17   history and characteristics and these really serious offenses

18   here.

19           You were looked up to, obviously.  There are a lot

20   of people in the Latin Kings as I understand it during the

21   time you were there who were teenagers, and you had been the

22   football hero.  You were the guy they looked up to.  You were

23   the guy that had muscle.

24           So a just punishment is I think probably as close as

25   I can get to why I have to impose a prison sentence on you.

1    Obviously some deterrent effect, but I think that you're kind

2    of beyond that.

3           And so I have to look at this and I have to grant a

4    downward variance because you left the gang in '09.  I have to

5    grant the variance because you were unusually cooperative and

6    that you appear truly to have begun a new lifestyle or

7    attempted to begin a new lifestyle.  And then there appears to

8    be a period of time you spent in jail here for gang-related

9    activities, a brief period of time, and I have to grant a

10   downward variance for that.

11          So we start out with a sentence of 135 to 168.  I

12   think 106 months in prison puts you in a proportional position

13   to other people with this violence and with the drugs and with

14   the guns factored in on this matter.  Your withdrawal is much

15   to your credit, but it was a little late, I must add.

16          So I'm going to place you on supervised release for

17   three years after you serve the 166 months -- 106 months, I'm

18   sorry.  While you're in the prison system I'm going to require

19   that you get some educational and vocational programming.

20   You've done a pretty good job while you were in high school,

21   and looking at vocational programming, you appear to be

22   smart.  You appear to be able to learn quickly, and it seems

23   to me you can continue with your skill set so you can prepare

24   yourself for eventually coming back out and getting a good job

25   and making some money here to support this family.

1          I want no alcoholic beverages.  I want you to have

2     nothing to do with any drugs of any kind, and that includes

3     marijuana.  I want you to be drug-tested initially to prove to

4     us quickly that you are not going to be involved with it.

5          I want you to be employed during your period of

6     supervised release for at least 40 hours a week.  I want you

7     to provide access to any financial information and credit

8     information and loan transaction information, and I want you

9     to file an IRS Form 8821 authorizing disclosure of tax

10    information.

11         I want you to reside in a residence approved in

12    advance by the probation officer, and hopefully it will be

13    someplace where you have -- you are surrounded by family.  And

14    if I could, I would tell your parents to give you -- to give

15    them full authority, and your wife as well, to keep track of

16    you and keep you on the straight and narrow, and you listen to

17    them.  No one loves you more in this world than your parents

18    and your spouse.  You know that.

19              DEFENDANT CABRERA:  I do know that.

20              THE COURT:  No one cares more about where you're

21    going to be when you get out than do they.  So listen to them

22    and respect them.

23         I want no contact with any known or suspected gang

24    members, that may include family members, and no indicia of

25    any clothing or anything that looks gang-related.

 1              I'm going to waive a fine requirement, and monies
 2   that you may earn while in the prison system, I'm going to
 3   request that that be used for child support.
 4              Also in terms of placement, I don't have much say in
 5   this, but I'm going to request placement as close to family in
 6   west Michigan as possible.  I can't guarantee anything, but
 7   usually -- I do it so seldomly that usually they try and
 8   accommodate me in that regard.
 9              Do you have any questions about the sentence I'm
10   imposing in this matter?
11              DEFENDANT CABRERA:  No, I don't.
12              THE COURT:  Okay.  Any questions from the
13   government?
14              MR. GREEN:  Is there a special assessment of $100,
15   Your Honor?
16              THE COURT:  Yes, there's a special assessment of
17   $100, you're correct.
18              Any questions about the sentence the Court is
19   imposing, Mr. Faraj?
20              MR. FARAJ:  No, Your Honor.  I'm going to -- no, not
21   with respect to the sentence.
22              THE COURT:  Any legal objection to the sentence
23   imposed not previously raised?
24              MR. FARAJ:  No, Your Honor.
25              THE COURT:  Government, Mr. Birge (sic)?  Okay.

1                 You have a right of appeal of this sentence and this

2       conviction.   You have 14 days in which to file that appeal.

3       Your obligation will be upon counsel to assist you should you

4       desire to appeal in this matter, and you'll be remanded to the

5       federal marshal for execution of this sentence.

6                 Write to me, Mr. Cabrera.   I want to hear from you.

7       I want to hear what you're learning.   I want to hear what

8       you're thinking and what you're doing in the prison system.

9       This is a time-out when you have a chance to reevaluate where

10      you're going to go for the rest of your life, where you have a

11      chance to study and read.   Please don't watch television and

12      play stupid cards and all those things like people do.   Please

13      use that time valuably to educate yourself.

14                DEFENDANT CABRERA:   I will.

15                THE COURT:   All right.   Okay.   I'll look forward to

16      hearing from you, then.

17                MR. FARAJ:   Your Honor, I have a motion to continue

18      his bond and to self-surrender.   He's currently out on bond.

19      He's not violated.   He has complied with all conditions.   He's

20      been employed.   He resides with his family, his wife, kids,

21      mother and father and children.

22                THE COURT:   Generally when I sentence something like

23      this, I sentence it right away so we get it underway.   I find

24      placement's a lot quicker if I do it right now than if I

25      wait.   So your request is respectfully denied.

```
 1              Do you have a motion to dismiss these other counts
 2    that are in this matter?
 3              MR. GREEN:  I do, Your Honor.  I believe they're
 4    Counts 2, 3, and 14.
 5              THE COURT:  Counts 2, 3, and 14, okay.  They are
 6    dismissed at this time.  Anything else?
 7              MR. GREEN:  No, Your Honor, thank you.
 8              THE COURT:  That's all.
 9              MR. FARAJ:  Nothing further, Your Honor.
10                 (Proceedings concluded at 3:42 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF REPORTER

I, Kevin W. Gaugier, Official Court Reporter for the United States District Court for the Western District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the within-entitled and numbered cause on the date hereinbefore set forth.

I do further certify that the foregoing transcript was prepared by me.

/s/  Kevin W. Gaugier

Kevin W. Gaugier, CSR-3065
U.S. District Court Reporter
110 Michigan N.W.
622 Federal Building
Grand Rapids, MI 49503